UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| v.                              ) | No. 15-cr-10127-MLW |
| ) | |
| TIMOTHY R. FLAHERTY,            ) | |
|     Defendant.      ) | |
| _____ ) | |

## DEFENDANT'S SUPPLEMENTAL MOTION FOR DISCOVERY AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Local Rule 116.3(g) of the United States District Court for the District of Massachusetts and the Due Process Clause of the Fifth Amendment to the United States Constitution, the Defendant, Timothy R. Flaherty ("Flaherty"), incorporates the previously filed and pending *Motion and Incorporated Memorandum of Law Seeking an Order Requiring the Government to Produce Department of Justice and United States Attorney's Office Records Demonstrating the Unlikelihood of Any Federal Investigation and/or Prosecution for Violations of 18 U.S.C. §249.* (D. 17) and incorporates that motion and its discovery requests in its entirety and supplements that motion with additional particularized requests for discovery that the government has declined to produce. In addition to the information requested in his first discovery motion, Flaherty seeks an order for the production of the following information:

### *Fowler Requests*

1. All information, including reports, letters, emails, memoranda and notes concerning the "relevant communications" that are alleged to have reached federal authorities by December 23, 2014 and December 24, 2014, as stated in the government's July 10, 2015 discovery response letter. This request seeks the substance of those communications, as well as the time, place and manner of those communications. Consistent with the Defendant's position, this information is material to preparing a defense to the federal nexus that the government is required to prove under Fowler v. United States, 131 S.Ct. 2045 (2011). Alternatively, if there are no documents, a statement detailing the

communications between state authorities and the USAO and/or other federal law enforcement or prosecutors on these dates.

2. All information from the Massachusetts State Police (hereinafter "MSP", an agency that the previously produced discovery alleges is involved in a joint investigation with federal authorities), including reports, memoranda, letters, emails, and notes, concerning the initiation of an investigation into witness tampering allegations against Flaherty.

3. All information from the MSP, including reports, memoranda, letters, emails, and notes concerning any communications between the MSP and the following agencies and entities: the Federal Bureau of Investigation (hereinafter "FBI"), the Cambridge Police Department, the Malden Police Department, the Middlesex District Attorney's Office (hereinafter "MDAO"), and the United States Attorney's Office (hereinafter "USAO") concerning their investigation of witness intimidation allegations against Flaherty.

4. All reports, memoranda, letters, emails, and notes concerning contact between the MDAO and the MSP , the Cambridge PD, the Malden PD, the FBI and the USAO prior to the December 24, 2014 Dunkin' Donuts meeting concerning their investigation of witness tampering allegations against Flaherty.

5. All reports, memoranda, letters, emails, and notes concerning contact between the MDAO and the MSP, the Cambridge PD, the Malden PD, the FBI and the USAO from December 24, 2014 to January 7, 2015, concerning their investigation of witness tampering allegations against Flaherty.

6. All reports, memoranda, letters, emails, and notes concerning contact between the MDAO and the MSP, the Cambridge PD, the Malden PD, the FBI and the USAO from January 7, 2015 until the Indictment of Flaherty on May 26, 2015, concerning their investigation of witness tampering allegations against Flaherty.

7. All information, including reports, memoranda, letters, emails, and notes, concerning interviews and debriefings with Reda Bichri ("Bichri") prior to the Dunkin Donuts meeting with Flaherty on December 24, 2014 by the MSP, the FBI, the MDAO, the USAO, the Cambridge PD and/or the Malden PD.

8. Any and all information, including reports, memoranda, letters, emails, and notes concerning any communications between federal and state authorities regarding:

   a. efforts to investigate the practices and policies regarding Accord and Satisfaction in the state courts (M.G.L. c. 276, § 55); and

   b. any debriefings/ instructions as to how Bichri should proceed with Flaherty with respect to the Accord and Satisfaction.

9. All guidelines, policies, memoranda, and letters concerning the MDAO's referral of civil rights cases to DOJ and/or the USAO.

10. All information, including reports, memoranda, letters, emails, and notes, concerning the MDAO's decision to refer for investigation and/or otherwise contact DOJ, the USAO, and/or the FBI regarding possible civil rights violations by Ralph Feinberg .

11. All information, including reports, memoranda, letters, emails, and notes, concerning the January 7, 2015 meeting among the MDAO, MSP, FBI and USAO, including the decision to initiate a federal civil rights investigation with respect to the Ralph Feinberg matter.

12. Any and all information, including reports, memoranda, letters emails, and notes containing information consistent or supportive of the fact that the federal involvement in the Feinberg investigation was caused or influenced in whole or part by the necessity to have a federal criminal investigation involving Bichri in order to federalize the allegations that Flaherty engaged or was engaging in witness tampering.

13. Copy of the Letterhead Memorandum (LHM) forwarded to DOJ. (The government has stated that it will request this information and produce it "if it is discoverable."  (See D. 25 at Request #19.))

14. All information, including reports, memoranda, letters, emails, witness statements, physical evidence, and notes, relating to the investigation into the possibility of federal civil rights violations by Ralph Feinberg against Bichri.

15. Any and all records, reports, documents, and data reflecting the number of federal criminal investigations commenced in the District of Massachusetts for "hate" crime offenses for each year from 2012 through 2015;

16. As to each such federal criminal investigation, any and all records, reports, documents, and data reflecting whether:

    a. the federal criminal investigation was commenced during the pendency of a state criminal prosecution for the same alleged criminal conduct;

    b. the federal criminal investigation was commenced following an adjudication in the state courts for the same criminal conduct;

    c. the federal criminal investigation was commenced following a state court conviction for the same criminal conduct;

    d. the federal criminal investigation was commenced based on a single verbal statement alleged by the victim to have been made by a private citizen (rather than

a law enforcement officer) during a single encounter that lacked any indicia of premeditation or plan or being part of a pattern of similar conduct;

e. the federal criminal investigation was commenced based on the uncorroborated statement of an alleged hate crime victim charging that the potential target used language indicative of bias based on nationality; and

f. the federal criminal investigation was commenced based on the uncorroborated statement of an alleged hate crime victim charging that the potential target used language indicative of bias against Mid-Easterners or Muslims.

17. Any and all records, reports, documents and data reflecting the number of allegations of the use of "hate" crime language during criminal offenses that were prosecuted in the Commonwealth of Massachusetts as state offenses that did not result in federal criminal investigations.

18. Any and all records, reports, documents and data reflecting the number of allegations of "hate" crime offenses for each year from 2012-2015 that were reviewed by the Civil Rights Division of DOJ nationwide and whether:

a. they resulted in federal criminal investigations;

b. they resulted in federal criminal prosecutions;

c. they were reviewed and rejected as being the basis for each federal criminal investigation or prosecution;

d. as to those that were approved for federal criminal investigation the number that were commenced during the pendency of a state criminal prosecution for the same alleged criminal conduct;

e. as to those that were approved for federal criminal investigation and/or prosecution the number that were commenced following a state court adjudication for the same criminal conduct;

f. as to those that were approved for federal criminal investigation and/or prosecution the number that were commenced following a state court conviction for the same criminal conduct;

g. as to those that were approved for federal criminal investigation and/or prosecution the number that were commenced based on a single verbal statement alleged by the victim to have been made by a private citizen (rather than a law enforcement officer) during a single encounter that lacked any indicia of premeditation or plan;

    h. as to those that were approved for federal criminal investigation and/or prosecution the number that were commenced based on the uncorroborated statement of an alleged hate crime victim charging that the potential target used language indicative of bias based on nationality;

    i. as to those that were approved for federal criminal investigation and/or prosecution the number that were commenced based on the uncorroborated statement of an alleged hate crime victim charging that the potential target used language indicative of bias against Mid-Easterners or Muslims.

19. As to any federal criminal investigation and/or prosecution that was referred to and/or reviewed by DOJ's Civil Rights Division and approved for federal criminal investigation and/or prosecution, any document, record, or report indicating the alleged factual basis of the "hate" crime and the basis for any decision to investigate and/or prosecute.

20. As to any referral or review by the Civil Rights Division of any allegation of a "hate" crime offense that was not approved for federal criminal investigation and/or prosecution, any document, record or report indicating the alleged factual basis of the "hate" crime being reviewed and the basis for any decision not to approve federal criminal investigation and/or prosecution.

21. As to any allegation of a "hate" crime that was referred directly to the FBI, any document, report, or data reflecting the number that were federally investigated by the FBI and those that were not.

22. Any guidelines used by DOJ, the United States Attorney for the District of Massachusetts, or the FBI to determine the basis, standards, and procedures for commencing a federal criminal civil rights investigation and/or prosecution during the pendency of or after the conclusion of a state court criminal prosecution.

23. Any reports, documents, or other information as to whether there was a federal criminal investigation of the defendant's client, Ralph Feinberg, for the same alleged criminal conduct that was the subject of the pending Middlesex prosecution of Mr. Feinberg between December, 2014 and June, 2015, and if so its genesis and whether notice had been given to or approval granted by the Civil Rights Division of DOJ for such federal investigation by either the FBI or USAO. *See* United States Attorney's Manual §8-3.100, 110.

24. Any reports, documents or other information as to whether any involvement of federal law enforcement or prosecutors was targeting, not Ralph Feinberg's alleged hate crime, but instead the defendant's alleged obstructive conduct.

25. Any and all memoranda and notes regarding communications between MSP or MDAO personnel and Bichri regarding the content of what he should say to Flaherty during any recorded communication.

26. Any and all memoranda and notes regarding communications between FBI or USAO personnel and Bichri regarding the content of what he should say to Flaherty during any recorded communication.

### Silver Platter Doctrine

27. All information relating to the MSP's (or any other agency's) application for a <u>Blood Warrant</u>, (see <u>Commonwealth v. Blood</u>, 507 N.E.2d 1029 (Mass. 1987)), or a warrant pursuant to M.G.L. c. 272, § 99 authorizing the interception of:

    a.  telephonic communications between Flaherty and Bichri on December 23 and 24, 2014;

    b.  communications during the meeting between Flaherty and Bichri at Dunkin' Donuts on December 24, 2014;

    c.  all further communications between Flaherty and Bichri between December 24, 2014 through May 21, 2015.

28. With respect to the foregoing request, if no warrant was sought, then all information, including reports, memoranda, letters, emails, and notes concerning the decision to forego seeking a warrant for said interceptions.

29. All information, including guidelines, policies, memoranda, and letters, from the following agencies relating to the interception of oral or wire communications of criminal defense attorneys including, but not limited to, taping of such attorneys as to matters involving their representation of criminal defendants:

    a.  the Department of Justice (hereinafter "DOJ"), including the United States Attorney's Office for the District of Massachusetts;

    b.  the FBI;

    c.  the MDAO; and

    d.  the MSP.

30. Where no warrant was obtained for the interception of the Defendant's communications, and to the extent not already covered by the above requests, the Defendant requests all information concerning authorization to conduct warrantless interceptions of the following communications:

    a.  telephonic communications between Flaherty and Bichri on December 23 and 24, 2014;

     b.   communications during the meeting between Flaherty and Bichri at Dunkin' Donuts on December 24, 2014;

     c.   all further communications between Flaherty and Bichri between December 24, 2014 and May 21, 2015.

## **INTRODUCTION**

The main thrust of Flaherty's discovery requests concerns the question of whether a federal civil rights criminal investigation and/or prosecution was reasonably likely on December 23-24, 2014 and, separately, on May 6 and May 21, 2015, as opposed to "remote, outlandish, [and] simply hypothetical." United States v. Fowler, 131 S. Ct. 2045, 2052 (2011). It is the government's burden to prove the reasonable likelihood of a federal investigation. Id. The sad and grim reality is that widespread police killings and other official and non-official violence perpetrated on religious or racial minorities on a repeated and documented basis in many of our nation's cities go without federal criminal investigation or prosecution. This non-federally prosecuted criminal conduct is far more egregious than the purported underlying hate crime in this case. Here, Flaherty's client, Ralph Feinberg ("Feinberg"), and the government's informant/witness Reda Bichri ("Bichri"), were involved in a minor traffic accident. What allegedly followed was a very short heated verbal exchange involving incidental physical contact that was accompanied, according to Bichri (but not according to Feinberg), by a single sentence containing the utterance of racial epithet. These words if uttered could have easily been an effect rather than (as required by federal law) the cause of the spontaneous exchange between Feinberg and Bichri. The incident resulted in both felony and misdemeanor charges against Feinberg that remain pending in the state criminal justice system. Discovery is required to assist the defendant in contending that an essential element of the charged obstructive conduct is lacking and that he

will accordingly be entitled to prevail on a pretrial Motion to Dismiss or, at trial with a Judgment of Acquittal.

## BACKGROUND

On about May 26, 2015, a grand jury indicted Flaherty on a single count of federal witness tampering in violation of 18 U.S.C. § 1512(b)(3).[1]  Prosecutions under Section 1512 require a "federal nexus" to bring an otherwise state offense within federal jurisdiction. Accordingly, the indictment alleged that Flaherty attempted to interfere with a witness's communication to an officer investigating the commission or possible commission of a federal civil rights offense in violation of 18 U.S.C. § 249 rather than just a state law enforcement officer or prosecutor pursuing the pending state charges.

***The Alleged Underlying Federal Civil Rights Offense – December 15, 2014 Feinberg Incident.***

The alleged § 249 offense was based on a traffic incident between Feinberg and Bichri, a naturalized citizen of Middle Eastern descent, on December 15, 2014.  That evening, at about 9:33 p.m., Cambridge Police officers were drawn to what they believed was a "minor motor vehicle accident" at the intersection of Massachusetts Avenue and Douglas Street between Bichri's black Chrysler 300 and Feinberg's red Lexus sedan.  As officers arrived at the scene, Feinberg was driving away.[2]

Bichri told the officers that "that guy right there in the red car, he hit me. He tried to drag me with him by his car. He said to me you little Muslim fuck, fuck you, you fucking terrorist."

---

[1] 18 U.S.C. § 1512 states, in relevant part:
> (b) Whoever knowingly … corruptly persuades another person, or attempts to do so, … with intent to--
>> (3) hinder, delay, or prevent the communication to a law enforcement officer … of the United States of information relating to the commission or possible commission of a Federal offense …

18 USCS § 1512.

[2] Feinberg was stopped after a brief pursuit and arrested for various motor vehicle infractions.

(Ex. A, Cambridge Police Report at 2.)  According to the police report, Bichri later explained

that:

> he was traveling down Mass Ave towards Boston and made a left turn onto
> Douglas Street. As he was turning onto Douglas Street, the operator of the red
> Lexus began beeping at him "4 or 5 times". BIRCHI then stated that the operator
> of the Lexus shouted at him "Cambridge Police pull over! BIRCHI then stopped
> his vehicle immediately on Douglas Street and exited his vehicle to speak with the
> alleged police officer. BIRCHI approached the passenger's side door and asked
> the operator "is there something wrong". BIRCHI then asked to see a badge from
> the operator. BIRCHI explained to me that when he got out of his car and
> observed that the operator was not in uniform, he requested to see a badge.  The
> operator then exclaimed to BIRCHI "you little Muslim, fuck you, you fucking
> terrorist". BIRCHI then explained the operator grabbed his right hand pulling him
> into the vehicle, and attempted to drive away. BIRCHI explained to me that he
> felt he (the operator of the Lexus) was going to drive away with him attached to
> the car. I asked BIRCHI why did he exit his vehicle and approach the Lexus, even
> though there were no police lights or markings on it. BIRCHI stated that the only
> reason why he got out of his vehicle was because the operator of the Lexus
> identified himself as a Cambridge Police.

(Ex. A at 3.)

As will be detailed below, information in the government's possession, including a

witness interview conducted in February 2015 and a surveillance video of the incident,

significantly undermines Bichri's claims, his credibility, and accordingly the "reasonable

likelihood" that this minor incident would ever be selected for federal investigation or

prosecution.

Feinberg was arrested that evening.  The following morning, December 16, 2014,

Feinberg, was arraigned in the Cambridge District Court on charges including, *inter alia*, assault

and battery, assault and battery with a dangerous weapon, and assault and battery with intent to

intimidate a person because of a person's race, color, or religion.  (D. 2, Indictment at ¶ 2.)

***Flaherty Witness Contact***

The Indictment alleged that on December 16, following Feinberg's arraignment, Flaherty

contacted Bichri, and, on behalf of Feinberg, offered Bichri money "if the victim was willing to

tell the Middlesex District Attorney's Office that he was too busy to appear in court and was not

interested in cooperating with authorities."  (Indictment at ¶ 4.)  Several conversations followed.

On December 23, 2014, Bichri, at the direction of the Massachusetts State Police, agreed during

a phone call to accept $2,500 for what the Indictment alleged was in consideration of "the victim

advising the Middlesex District Attorney's Office that he was too busy to appear in court and was

no longer interested in the case." (Indictment at ¶ 7.)  Flaherty and Bichri agreed to meet the

following day.

On December 24, 2014, the MSP outfitted Bichri with a video camera and audio

recording device so that it could surreptitiously record the meeting between Flaherty and Bichri.

Presumably, Bichri was debriefed prior to his meeting with Flaherty.  No warrant was obtained

for this one-party consent interception, which the defendant will contend is a violation under

Massachusetts law.  The government has declined to provide information concerning

authorization for this interception.

Flaherty and Bichri met at a Dunkin' Donuts coffee shop in Malden at around 10:38 a.m.

Although the Indictment is silent about these facts, the video revealed that during the meeting,

Flaherty presented Bichri with an *Accord and Satisfaction* form, which Flaherty had drafted to

memorialize the agreement with Bichri to be filed in the district court.  (Ex. B, Accord and

Satisfaction, marked GJ Ex. 2.)  An Accord and Satisfaction is a statutorily authorized way to

dispose of a criminal matter by making the victim of the offense whole.[3]  The document that

Flaherty presented to Bichri read:

> Pursuant to G.L. c. 276, sec. 55, I, Reda Bichri, of 307 Clifton Street,
> Malden, MA, the complainant in the above-entitled case, acknowledge
> that I have received full and complete consideration for damages suffered
> as a result of the occasion that forms the basis of this criminal complaint.

Bichri accepted $2,500 in cash from Flaherty but, presumably on instructions from state law

enforcement, would not sign the *Accord and Satisfaction*.  The entirety of this pivotal

conversation concerned the pending state proceedings and Flaherty's client's attempt pursuant to

a well-known state district court practice to resolve it without further litigation.  There was no

suggestion during the conversation of any foreseeable federal nexus to what was and remains a

paradigmatically state court matter.

On February 3, 2015, Bichri initiated a recorded call to Flaherty to discuss a summons

that Bichri had received to appear at a clerk magistrate's hearing in the Cambridge District

Court.  The hearing, which Feinberg requested through an application for a cross-criminal

complaint, was to determine whether charges should be issued against Bichri for assault and

---

[3] Massachusetts General Laws, Chapter 276, § 55 states that:

> If a person committed to jail is under indictment or complaint for, or is under
> recognizance to answer to, a charge of assault and battery or other misdemeanor for
> which he is liable in a civil action, unless the offence was committed by or upon a sheriff
> or other officer of justice, or riotously, or with intent to commit a felony, or is a violation
> of an order issued pursuant to section 18 or 34B of chapter 208, section 32 of chapter
> 209, section 3, 4 or 5 of chapter 209A or section 15 or 20 of chapter 209C, a violation of
> sections 13M or 15D of chapter 265 or would otherwise constitute abuse, as defined in
> section 1 of said chapter 209A, and the person injured appears before the court or justice
> who made the commitment or took the recognizance, or before which the indictment or
> complaint is pending, and acknowledges in writing that he has received satisfaction for
> the injury, the court or justice may in its or his discretion, upon payment of such expenses
> as it or he shall order, discharge the recognizance or supersede the commitment, or
> discharge the defendant from the indictment or complaint, and may also discharge all
> recognizances and supersede the commitment of all witnesses in the case.

M.G.L. c. 276, § 55.

battery of Feinberg during the same incident.  Feinberg submitted an affidavit in support of his

application that detailed Bichri's attack on Feinberg, who never left his vehicle.  (Ex. C,

Application for Criminal Complaint.)  Bichri was seeking to have Feinberg withdraw the

complaint application.  Flaherty later confirmed that Feinberg withdrew the application.

On May 6, 2015, Bichri initiated another recorded call to Flaherty, this time claiming that

someone from the United States Attorney's Office had left a voicemail for Bichri.  Flaherty

incredulously asked Bichri "About what? About this?"  Bichri replied, "I guess, yeah, basically."

Flaherty told Bichri, "Yeah, ignore her, you don't have any obligation to talk to her."  Flaherty

explained, "*You know, this is not a federal case, I wouldn't even get involved in that shit*."  (Ex.

D, Transcript (emphasis added).)

On May 21, 2015, two days after a grand jury was convened to investigate Flaherty,

Bichri called Flaherty again, this time claiming that an agent from the FBI had left him a

voicemail about Feinberg's case.  Flaherty again explained to Bichri that he had no obligation to

call the agent back.   Flaherty told Bichri that he had a right not to talk to anyone.  When Bichri

pressed, "so should I call him back or not?" Flaherty told him, "No. Don't call him back."  (Ex.

E, Transcript.)

May 21, 2015 was the last contact between Flaherty and Bichri.  Flaherty was indicted on

May 26, 2015 and arrested on May 27, 2015.  Feinberg's state court trial, which was scheduled

for May 28, 2015, was continued and that case remains pending in the Cambridge District Court.

No federal prosecution has been brought against Feinberg.  No federal investigation of the

underlying civil rights case has occurred other than an interview with a third party on February 5,

2015 who disputed Bichri's version of the offense and the acquisition of video surveillance that,

like the third party witness, documents that Bichri's statements to law enforcement were not

trustworthy.  No federal prosecution of Feinberg has been initiated.  No evidence exists that the state criminal justice system cannot resolve the Feinberg matter in a way that fully vindicates any federal as well as state interest.  In short, there was "no reasonable likelihood" of an ongoing federal investigation in May even if, arguendo, one commenced in January, see infra, and every indication from the discovery produced up to now that there was in fact no initiation of any federal interest (and no reasonable likelihood of any foreseeable federal involvement in the Feinberg case until weeks after the December 23-24, 2014 conversations and meeting involving Flaherty that are discussed above).

On June 26, 2015, in his L.R. 116.3(A) discovery letter, Flaherty made several requests for material information, including information regarding the federal investigation into Feinberg. (D. 21.)  The government declined to produce most of the requested information by letter dated July 10, 2015.  A supplemental discovery letter was sent to the government on July 20, 2015 requesting the materials in items 1 and 30.  Because the government's fourteen day deadline for a response will occur following the deadline for filing discovery motions on the first letter, those requests are included herewith.

## **DISCUSSION**

The government has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." United States v. Prochilo, 629 F.3d 264, 266 (1st Cir. 2011) (citing Brady v. Maryland, 373 U.S. 83 (1963)).  Information is "favorable" under Brady if it "relates to guilt or punishment and . . . tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005).

Discovery is not limited to only exculpatory information.  Discovery under Rule 16 includes evidence that is material to the defense, which may include inculpatory information as well.[4]  Under Rule 16, the defendant:

> is entitled to relevant evidence, even if inculpatory.  He need not show that the statements are material or exculpatory.  Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

United States v. Pesaturo, 519 F.Supp.2d 177, 189 (D. Mass. 2007) (internal quotation marks omitted); see also United States v. Poindexter, 727 F. Supp. 1470, 1473 (D.C. Cir. 1989) ("The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interests of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case."); United States v. Karake, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (Evidence is "material" under Rule 16, "whether inculpatory or exculpatory, as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating

---

[4] The Federal Rules of Criminal Procedure require:

> [u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> > (i) the item is material to preparing the defense;
> >
> > (ii) the government intends to use the item in its case-in-chief at trial; or
> >
> > (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

testimony, or assisting impeachment or rebuttal.") (quoting <u>United States v. Marshall</u>, 132 F. 3d 63, 68 (D.C. Cir. 1998)) (internal quotation marks omitted).[5]

Demonstrating materiality "is not a heavy burden." <u>United States v. Lloyd</u>, 992 F.2d 348, 351 (D.C. Cir. 1993). "[T]he phrase material to the preparation of the defendant's defense 'means the defendant's response to the Government's case in chief.'" <u>Pesaturo</u>, 519 F.Supp.2d at 190 (D. Mass. 2007) (quoting <u>United States v. Armstrong</u>, 517 U.S. 456, 462 (1996)). The Rule 16 materiality analysis "focus[es] upon the usefulness of the information sought in defending the case." <u>Pesaturo</u>, 519 F. Supp. 2d at 190-91 (collecting cases). Accordingly, prosecutors should take a broad view of what information is "material" for disclosure purposes and should not engage in predictions about what value it might have to the defense. <u>Safavian</u>, 233 F.R.D. at 16 ("The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed.").

The search for material information extends to a search of information that is in the possession, custody, or control of the all agencies that participate in the investigation. <u>See</u> <u>Smith v. New Mexico Dep't. of Corrs.</u>, 50 F.3d 801, 824 (10th Cir. 1995)("the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office as well as law enforcement personnel and other arms of the state

---

[5] Notably, moreover, Rule 16 establishes the "minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." Advisory Committee Note to Fed. R. Crim. P. 16

involved in investigative aspects of a particular criminal venture.")(internal citation omitted);

United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)(finding duty to search "files

maintained by branches of government 'closely aligned with the prosecution'")(and cases cited).

Because the Feinberg investigation was represented by the Government during automatic

discovery to be a joint investigation with state prosecutors, the government is obligated to

produce information that is within the custody and control of all state law enforcement agencies

involved in the investigation, including the Middlesex District Attorney's Office.

**I.      Flaherty is entitled to information material to the federal nexus element that the government must prove.**

Flaherty hereby incorporates the arguments previously set forth in his *Motion and

Incorporated Memorandum of Law Seeking an Order Requiring the Government to Produce

Department of Justice and United States Attorney's Office Records Demonstrating the

Unlikelihood of Any Federal Investigation and/or Prosecution for Violations of 18 U.S.C. §249.*

(D. 17.)  The information that Flaherty seeks in items 1 - 26 is material to a preparation of the

defense to the federal nexus element that the government must prove.  In a prosecution under 18

U.S.C. § 1512(b)(3), the government must prove a federal nexus between the "persuasion" act in

paragraph (b) and the object of the interference in the subsequent subsections.  Arthur Anderson

LLP v. United States, 544 U.S. 696, 707 (2005).  Proof of a *federal* nexus is necessary because

Section 1512 was not intended to bring within its ambit "instances of witness tampering in

purely state investigations."  Fowler v. United States, 131 S.Ct. 2045, 2051 (2011).   In Fowler,

the Supreme Court held that where a defendant is charged under subsection (b)(3) with the intent

to prevent communication with a federal law enforcement officer, the government must prove

that "it is reasonably likely under the circumstances" that in the absence of the defendant's

interference, at least one of the relevant communications would have been made to a federal

16

officer." Id. at 2052. "[T]he Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." Id.

In its response to Flaherty's discovery letter, the government claimed that it received "relevant communications" regarding the Feinberg incident by at least December 23, 2014. The government reasoned, therefore, that "the Fowler 'reasonable likelihood' standard established to address hypotheticals and unknowns is not applicable." (D. 25 at 1.) Other than this bare statement, however, the government provided no information concerning the content of these communications, whether they were focused on Flaherty rather than on the imperative of commencing a federal civil rights case of Feinberg – an implausibility given the limited resources devoted nationally to federal civil rights prosecutions and the relatively *de minimus* nature of the allegations that would meet the essential elements of any federal criminal law (not to mention the pendency of a perfectly adequate set of state court charges designed to vindicate law enforcement's interest in whatever offense occurred in Central Square Cambridge in mid-December of 2014).

The assurance in its July 10, 2015 discovery letter that "relevant communications had already reached federal authorities" by December 23, 2014, standing alone, does not federalize the ensuing meeting between Flaherty and Bichri on December 24, 2014. At this meeting, Flaherty discussed an Accord and Satisfaction – a frequently employed codified state practice of resolving state criminal assault allegations – while the state law enforcement agents (not the FBI, not the USAO) recorded the conversation.  Nor does this assurance obviate the applicability of the Fowler test to that meeting. The mere fact that state and federal authorities had a "communication" on December 23, 2014 does not transform a state investigation and

prosecution into a federal one nor does it create the "reasonable likelihood" that a future federal investigation or prosecution will supersede the pending state matter as required by <u>Fowler</u>.

The circumstances of the Feinberg incident make it reasonably *un*likely that the "relevant communications" concerned Feinberg and the federal government's interest in investigating him for a hate crime.  More likely is that the "relevant communications" were focused on Flaherty's interactions with Bichri, conduct that was purely a state concern under the circumstances.  The discovery provided to date suggests that the latter scenario is the more plausible one and that federal involvement was an effort to federalize an investigation of Flaherty.

The government has provided nothing in discovery to support its claim that "there was an investigation commenced by federal authorities on December 23, 2014." (See D. 25, Govt. Discovery Letter.)  To the contrary, FBI reports demonstrate that the federal government did not become involved until January 7, 2015 at the earliest and that a federal criminal law enforcement investigation was not even ostensibly opened until January 21, 2015, well after the pivotal December 24, 2014 *actus reus* that is central to the witness tampering allegations.

A January 21, 2015 FBI Report regarding Feinberg opens with the statement that "*an investigation [is] currently being conducted by the Cambridge Police Department*", (Ex. F, FBI 1057, dated January 21, 2015 at 1 (emphasis added).), indicating that on December 23-24, i.e., before January 21, 2015, the investigation was purely state and thus subject to the <u>Fowler</u> test which in turn is the basis for the discovery requests particularized above.   The report makes no mention of an investigation by federal officers as of that date.  It did, however, contain the notation "Full Investigation Initiated: 01/21/2015." (Ex. F at 1.)  In identifying the first instance of federal involvement, the report stated that on January 7, 2015, two weeks after Flaherty's and Bichri's Christmas Eve meeting at Dunkin' Donuts:

investigators with the FBI and Massachusetts State Police met with members of the Middlesex District Attorney Office and United States Attorney's Office for the District of Massachusetts. During the meeting, the most recent incident in Cambridge involving FEINBERG was discussed as well as FEINBERG's past criminal history to include his past civil rights charges. ***At the conclusion of the meeting, AUSA Fisher indicated his office would initiate a civil rights investigation regarding this matter***. It was also agreed that the FBI Boston Division and Massachusetts State Police would jointly investigate this matter.

(Ex. F at 6 (emphasis added).)

This report identified the three civil rights statutes that the government decided it would investigate – "18 U.S.C. 241 (Conspiracy Against Rights); 18 U.S.C. 245 (Federally Protected Activities) 18 U.S.C. 247 (Church Arson Prevention Act of 1996)."  (Ex. F at 2.)  These three statutes were non-starters that had no practical application to the Feinberg incident.  There was no prima facie civil rights conspiracy to violate 18 U.S.C. § 241:  the factual predicate showed no co-conspirator.  There was no interference with federally protected activities under 18 U.S.C. § 245:  the factual predicate showed no travel on interstate roads.  There was no prima facie violation of the "Church Arson Prevention Act", 18 U.S.C. § 247.

Indeed, none of these three statutes was cited in the Indictment as the eventual subject of a federal investigation.  Instead, the Indictment identified a fourth statute, 18 U.S.C. § 249, as the underlying federal offense.  It alleged that Feinberg's "alleged conduct *could* constitute a federal hate crime pursuant to 18 U.S.C. § 249."[6]  (D. 2, Indictment at ¶2 (emphasis added).)  The

---

[6] Section 249(a)(1) punishes:

> Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person—

18 U.S.C. § 249(a)(1).

suggestion that the Feinberg incident could constitute an offense worthy of prosecution under §

249 is unsupportable on the facts of this case.

The factual predicate – "road rage", a traffic accident (which involved the Bichri's

limousine striking Feinberg's car), shouting an alleged defamatory single sentence following the

traffic incident, and alleged minor physical contact – does not intrinsically elevate the matter to a

foreseeable federal civil rights prosecution.  Police killings of defenseless minority citizens,

church and residence arson cases, brutal attacks on racial or religious minorities, gang activity

caused by bigotry or anti-semitism all are investigated and prosecuted exclusively by the state

with very few successive federal prosecutions.  There was certainly no "reasonable likelihood"

as of December 24, 2014 that there would be any federal involvement in the Feinberg case.[7]

The empirical statistics also show the improbability of a federal civil rights prosecution.

*In 2014, the Department of Justice Civil Rights Division authorized only 58 prosecutions for all*

*civil rights statutory violations (not just 18 U.S.C. § 249).  There has been only one such*

*criminal prosecution in the District of Massachusetts in the last 3 years for any civil rights*

*crime.*

The improbability of a federal investigation is further augmented by the statutory

mandate of the federal civil rights criminal statutes (and the Petite Policy of the Department of

Justice) all requiring certification that there existed, **following the state prosecution**, some

special inadequacy of the state legal system to respond to racial or religiously motivated crimes

to warrant federal participation.   Prosecutions under § 249 require as a precondition that:

> (A) the State does not have jurisdiction;

---

[7] Even a review of Feinberg's prior federal PSR would not change the probabilities:  it would show 3 prior incidents over 16 years where Feinberg used defamatory language against others.  His history reflects no physical violence associated with his ugly words and no premeditated criminal conduct based on race or religion.

(B) the State has requested that the Federal Government assume jurisdiction;

(C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

(D) a prosecution by the United States is in the public interest and necessary to secure substantial justice

18 U.S.C. § 249(b)(1).

At the time of the December 23-24, 2014 communications and payment, there was a pending state prosecution, involving both felonies and misdemeanors, resulting from a Cambridge Police arrest of Feinberg. The allegations were within the heartland of state criminal jurisdiction – charges of assault, assault with a dangerous weapon, failure to stop for a police officer, and reckless operation of a motor vehicle, and assault and battery with intent to intimidate because of a person's religion. These charges are all state offenses, all within the jurisdiction of the Cambridge District Court, and all regularly prosecuted as state matters.

The government has provided little information regarding its investigation of Feinberg. This information is material to the <u>Fowler</u> issue as it pertains to both the December 2014 communications and the May 2015 communications. Based on what the government has produced to date, however, there was no legitimate federal effort toward investigating the Feinberg incident. Flaherty maintains, and the government's investigative efforts suggest, that the government was motivated not by the aim of causing a rare federal civil rights prosecution of Feinberg (particularly not while state charges for the same conduct were pending), but instead by an objective to substitute federal prosecutorial authority for state authority to prosecute Flaherty i.e. by "federalizing" Flaherty's contact and conversations with Bichri.

The only two pieces of federal investigative materials that the government has provided concerning the Feinberg incident actually exculpate Feinberg and raise serious questions about Bichri's veracity.  The first was an FBI interview on February 5, 2015 of Alex Figueroa ("Figueroa"), a witness to the incident.  (Ex. G, Figueroa FBI 302.)  Figueroa witnessed the interaction with Bichri.  Figueroa stated that he heard the men arguing about passing.  Despite hearing the content of the argument, Figueroa did not hear the racial epithets that Bichri claimed were uttered.  Figueroa's statements clearly fall under the definition of exculpatory information. Inexplicably, however, Figueroa's exculpatory statements were never turned over to Flaherty during his representation of Feinberg in the state court – an omission consistent with the FBI viewing its role as being focused on Flaherty not Feinberg.

There is no question that the Figueroa information should have been turned over to Flaherty.  Figueroa was identified as a Commonwealth witness when the Commonwealth provided its discovery notice along with mandatory discovery in the state court case on March 12, 2015.  (See Ex. H, Commonwealth's Notice of Discovery I at Section XIV.)  In addition to bedrock constitutional requirement to produce all exculpatory information, Massachusetts Rules of Criminal Procedure mandate that the Commonwealth produce "Material and relevant police reports, photographs, tangible objects, all intended exhibits, reports of physical examinations of any person or of scientific tests or experiments, ***and statements of persons the party intends to call as witnesses***."  Mass. R. Crim. P. 14(a)(1)(A)(vii).

Despite the federal investigation purportedly being part of a joint investigation with the MDAO as to the conduct of Feinberg, state court prosecutors did not disclose Figueroa's statement to Feinberg in the Cambridge District Court at any time prior to Feinberg's original

trial date of May 28, 2015.[8]  The Feinberg state court prosecution remains pending as of the

filing of this motion.  To date, Feinberg's state court defense team has not received any

information that was developed by federal officials during their part of the "joint investigation"

into the Feinberg incident.

If the Figueroa interviews were authentically part of a joint investigation of the

underlying civil rights allegations against Feinberg, this information would have been shared

with state prosecutors, who are part of the prosecution team.  If it was not, then either the FBI or

the United States Attorney's Office presumably decided not to disclose exculpatory information

in Feinberg's state court prosecution.  This decision provides further evidence that the FBI

investigation was not aimed at Feinberg but rather at Flaherty.  There can be no other plausible

justification for a decision that violated Feinberg's rights in order to further (by keeping secret)

the apparent federal investigation not of Feinberg but of Flaherty.

The second piece of exculpatory evidence was a surveillance video of the incident that

the government provided to defense counsel on July 13, 2015.  The video captured the incident

and calls into serious question the veracity of Bichri's allegations.  Like the Figueroa interview,

this video was not produced to Feinberg in his state court prosecution prior to Flaherty's

Indictment.

The relevant excerpt from that video is attached as **Exhibit I**.[9]  For example, the video

shows Feinberg stopped behind Bichri as Bichri waited for pedestrians to cross in front of him.

Bicrhi then backed up into Feinberg's car.  After backing into Feinberg, Bichri drove off, only to

return to the scene of the accident.  Bichri got out of the car to confront Feinberg through the

passenger window of Feinberg's vehicle.  Bichri then circled behind Feinberg's car and

---

[8] Flaherty was arrested on May 27, 2015, the day before Feinberg's trial.
[9] Because the video cannot be submitted via ECF, Exhibit I will be provided under separate cover.

approached the driver's side.  Feinberg drove off at that point.  The video does not show Bichri's arm pulled into the car nor Bichri being dragged as Feinberg drove away.  Like the Figueroa interview, the video is inconsistent with Bichri's narrative –which, even now, is the only basis for any allegation of a racial or religious biased statement by Feinberg.  Evidence challenging Bichri's truthfulness is evidence further diminishing the "reasonable likelihood" of any continuing good faith federal criminal investigation of Feinberg.

The video in fact is consistent with Feinberg's rendition, which he attested to in an affidavit he filed in the Cambridge District Court on December 16, 2014, just after he was arraigned.  The affidavit was submitted in support of a cross-criminal complaint against Bichri for assault and battery.  It was produced by the government in discovery.  In his affidavit, Feinberg stated under oath that:

(1) On 12/15/15 [sic] at approximately 10:00 p.m. I was making a turn from Mass Ave to Douglas when a vehicle began backing up in traffic towards my vehicle.  I beeped my horn and signaled for him to stop repeatedly.

(2) The driver of the vehicle exited his car and approached my passenger window where he stated "Get the fuck out of the way or I will bitch slap you."  I responded words to the effect of, "Who do you think you are, a cop?"

(3) The driver of the vehicle then reached inside my vehicle and grabbed my wrist and began pulling me towards him.  I pulled away from him and he scratched my hand.

(4) The driver then began walking around my vehicle to the driver's side where I was located.  I was afraid and I drove away.  I was stopped by the police a few blocks away and I was arrested.

(Ex. C.)

All of this information was in the possession of the government well before it recorded any phone calls with Flaherty in May 2015.  The allegations made prior to this information would not reasonably give rise to a federal hate crime investigation.  But certainly after the government became aware of this information, no federal hate crime investigation, if that was the actual goal of government, would have continued.

Perhaps most striking of all is what the government has **not** produced from its purported Feinberg investigation.  The government has not provided any reports of interviews of Bichri regarding the Feinberg incident.  Interviewing Bichri, particularly in light of the Figueroa interview and the surveillance video, would seem an obvious early step in any authentic federal investigation of Feinberg (rather than the appearance of such an investigation to attempt to "federalize" the witness contacts and payments of Flaherty, which otherwise would fall exclusively within the aegis of the state prosecutors).  Yet based on the discovery that Flaherty has received, other than the initial Cambridge Police incident report, the only interviews of Bichri appear to have been by state authorities investigating allegations of witness tampering against Flaherty.  It is unclear whether either the State Police or the FBI has interviewed Bichri regarding the Feinberg incident since they became involved.  Not only were no such Bichri interview statements provided to Flaherty in this case, no such statements have been produced to Feinberg in his pending state court case.  This is remarkable considering the government claimed to have initiated an investigation where Bichri is the alleged victim of a federal hate crime.  If this information exists, however, it is critical to the Fowler issue that Flaherty must defend against.  Those statements must be produced.

The two intercepted conversations in May 2015 would appear to be the only two acts that occurred after federal officers were ostensibly involved.  On the state of the evidence, however, it is difficult to imagine that a federal investigation was ongoing or that there was a "reasonable likelihood" that there would be a prevention of communications to federal law enforcement investigating a federal offense (i.e., Feinberg's alleged violation of 18 U.S.C. § 249).  Nevertheless, in May 2015, Bichri twice spoke with Flaherty, each time pretending that he had been contacted by federal authorities, all in a "sting" designed to entrap Flaherty into discouraging communications with federal authorities.

All of this supports the defendant's position that the government created the appearance of a federal investigation into Feinberg in order to assert federal jurisdiction over Flaherty.  The government cannot manufacture jurisdiction over a state offense by creating a federal involvement in a state investigation for the purpose, not of prosecuting Feinberg federally, but of federalizing the antecedent witness "tampering" that would otherwise be purely state conduct.  Deciding that the FBI would join the Massachusetts State Police in investigating Feinberg does not extinguish the Fowler test if the purpose of federalizing the civil rights investigation was to manufacture federal jurisdiction over Flaherty's witness related conduct.  "[I]f the government unilaterally supplies an essential element of a crime, the government has in effect failed to prove that element as to the defendant."  United States v. Al Kassar, 660 F.3d 108, 120 (2d Cir. 2011).

No "voluntary, affirmative act" of Flaherty's allowed for or consented to the manufactured jurisdiction.  See United States v. Archer, 486 F.2d 670 (2d Cir. 1973)(no federal nexus where government manufactured out-of-state phone call for express purpose of converting state crime into federal offense).  Flaherty's express statement to Bichri in May was that there was no federal case.  Flaherty did nothing during the two brief May conversations to validate the

creation of jurisdiction.   Cf. United States v Djokich, 693 F3d 37, 45 (1st Cir, 2012) (where the defendant "voluntarily adopted" and "seized the opportunity" to redirect his criminal intentions to the United States).

Here, the government unilaterally created an otherwise unforeseeable and unlikely federal involvement in a pending state prosecution.  The government injected imaginary federal officials (e.g., a civil rights prosecutor who the government admitted did not exist, (see D. 25 at Response to Requests 37 and 38)) into Bichri's script.  Flaherty had no ability to control or validate whether there in fact was a good faith principled federal criminal investigation of Feinberg.  Flaherty's statements to Bichri were ones of disbelief that there was any federal involvement – and that Bichri had no obligation to speak to the federal officers (good advice that would be given by any competent defense attorney).

Discovery must be produced so that Flaherty can determine whether the catalyst for apparent federal involvement in the civil rights investigation was not principally to prosecute Feinberg federally (particularly given the pending state criminal prosecution) but instead to manufacture jurisdiction to prosecute Flaherty federally – a reason that would not constitute an exception to the Fowler formula for determining liability under 18 U.S.C. § 1512(b)(3). Discovery must also be produced because as of December 23-24, 2014, at the time of the initial recordings of Flaherty and the payment of $2,500, there exists proof of the absence of any indicia of federal involvement thus subjecting such communications to the Fowler test of "reasonable likelihood", a test, that on these facts, e.g., a pending state prosecution of a 1:1 incident with no physical or property injury, and with no corroboration of a single phrase of claimed defamation, cannot conceivably be met.

For the foregoing reasons, the Court should order the requested information because it is material to the federal nexus defense.

## II.   Flaherty is entitled to information in items 27 – 30 because they are material to a motion to suppress.

With respect to the information requested in items 27 – 30, which requests information related to the warrantless interception of Flaherty's communications, Flaherty is entitled to this information because it is material to a motion to suppress.  While federal law permits interceptions of communications where one party consents, Massachusetts law does not permit such interceptions.  Except in circumstances not applicable here, Massachusetts law prohibits the warrantless interception of oral and wire communications without the consent of all parties to the communication.  United States v. Sutherland, 929 F.2d 765, 769 (1st Cir. 1991) (citing M.G.L. c. 272, § 99).  In most cases, federal law, not Massachusetts law, would govern the admissibility of evidence.  The First Circuit, however, has recognized circumstances in which federal courts may suppress evidence that is obtained in violation of state law.  The First Circuit in Sutherland summarized a line of circuit decisions that suggested suppression might be warranted.

> If state law enforcement officers, acting without federal involvement and in knowing violation of state law, gather evidence which is inadmissible in state court but admissible in federal court, the federal court should not condone the use of such evidence because to do so would permit federal officials to "allow[] illegally seized evidence to be handed them on a 'silver platter.'"

Id. at 770.  The Sutherland Court recognized that this "silver platter doctrine" remains a viable defense and that:

> in an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse, this court might choose to exercise its supervisory powers by excluding ill-gotten evidence. This pronouncement is not ground-breaking; it merely traces the contours of a well-established power inherent in the federal courts.

Id.

Here, there is a factual basis to support a motion to suppress under the "silver platter doctrine."  Other than its bare statement in its July 10, 2015 discovery letter, the government has provided no information that the federal government was investigating Flaherty when his conversations were intercepted on December 23-24, 2014.  Rather, the information suggests that federal involvement in any investigations, be it into Feinberg or Flaherty, did not begin until January 7, 2015 at the earliest.  Prior to January 7, this was a purely state investigation involving the State Police.  State Police reports provided in discovery make no reference to federal involvement or the potential investigation into a federal hate crime.  Similarly, FBI reports make no reference to federal involvement in the December 2014 interceptions.  As such, there was no legal basis to conduct one-party consent interceptions.

The information that Flaherty seeks with respect to the decision to forego obtaining a wiretap warrant is material to Flaherty's defense and litigating a motion to suppress.  The state wiretap statute, M.G.L. c. 272, § 99, is clear on the requirement for law enforcement to obtain a warrant absent the consent of all parties.  The State Police, who regularly conduct wiretaps under Section 99, were well aware of this requirement.  The decision to disregard this statute is the type of "flagrant abuse of law by state officials" that Flaherty should have an opportunity to litigate. Accordingly, the Court should order the government to produce information concerning the decision to forego a wiretap warrant as well as information concerning the Fowler standard because the information is both exculpatory and material.

## CONCLUSION

For the foregoing reasons, Flaherty requests that the Court allow his motion and order the government to produce the requested discovery.

## REQUEST FOR ORAL ARGUMENT

Flaherty believes that oral argument may assist the Court and, therefore, requests a hearing on his motion.

## LOCAL RULE 7.1(A)(2) STATEMENT

Counsel have conferred in good faith with Government counsel and represents that there is a principled disagreement regarding the scope of discovery that the Government is required to produce, see Local Rule 116.3(f).

<table>
<tr><td></td><td>Respectfully Submitted<br>TIMOTHY R. FLAHERTY<br>By his attorneys,</td></tr>
<tr><td>/s/Martin G. Weinberg<br>Martin G. Weinberg, Esq.<br>Mass. Bar No. 519480<br>20 Park Plaza, Suite 1000<br>Boston, MA 02116<br>(617) 227-3700<br>owlmgw@att.net</td><td>/s/Thomas J. Butters<br>Thomas J. Butters, Esq.<br>BUTTERS BRAZILIAN LLP<br>Mass. Bar No. 068260<br>699 Boylston St., 12th Floor<br>Boston, MA 02116<br>617-367-2600<br>butters@buttersbrazilian.com</td></tr>
<tr><td></td><td>/s/Matthew D. Thompson<br>Matthew D. Thompson<br>BUTTERS BRAZILIAN LLP<br>Mass. Bar No. 655225<br>699 Boylston St., 12th Floor<br>Boston, MA 02116<br>617-367-2600</td></tr>
<tr><td>Date: July 24, 2015</td><td>thompson@buttersbrazilian.com</td></tr>
</table>

## Certificate of Service

I, Martin G. Weinberg, hereby certify that on this date, July 24, 2015, a copy of the forgoing document has been served via CM/ECF Electronic Filing, upon Assistant U.S. Attorney Robert Fisher and all other counsel of record.

/s/ Martin G. Weinberg
Martin G. Weinberg