# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA          . CRIMINAL NO. 15-10127-MLW
                                  .
         V.                       . BOSTON, MASSACHUSETTS
                                  . AUGUST 19, 2015
TIMOTHY R. FLAHERTY               .
  Defendant                       .
. . . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF MOTION HEARING
### AND INTERIM STATUS CONFERENCE
### BEFORE THE HONORABLE DONALD L. CABELL
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Robert A. Fisher, Esq.
S. Theodore Merritt, Esq.
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3612
Robert.Fisher2@usdoj.gov
Theodore.merritt@usdoj.gov

MARTIN G. WEINBERG, PC
Martin G. Weinberg, Esq.
20 Park Plaza, Ste. 1000
Boston, MA 02116
617-227-3700
owlmcb@att.net

BUTTERS BRAZILIAN LLP
Thomas J Butters, Esq.
One Exeter Plaza
699 Boylston St., 12th Floor
Boston, MA 02116
617-367-2600
butters@buttersbrazilian.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1   (Court called into session)

2   (10:13:19)

3          THE CLERK:  The case of the United States v.

4   Timothy Flaherty, Criminal Action No. 15-10127 will now be

5   heard before the Court.  Counsel please identify

6   themselves for the record.

7          MR. FISHER:  Good morning, Your Honor, Robert

8   Fisher, Ted Merritt for the United States.

9          THE COURT:  Good morning.

10          MR. MERRITT:  Good morning, Your Honor.

11          MR. WEINBERG:  Good morning, Your Honor, Martin

12   Weinberg along with Tom Butters and Matthew Thompson on

13   behalf of Timothy Flaherty who is present in Court.

14          THE COURT:  Okay, and good morning to you.  All

15   right.  So we're here for a few different reasons.  We're

16   here for a status conference and there are also a number

17   of pending motions, and if you don't mind I want to start

18   at the end and then work our way back because just

19   logistics wise, I'm going to be in and out but for the

20   most part not very accessible for the next two weeks and

21   I'll be back the first full week of September. And so

22   contemplating that our timing on resolving some of these

23   issues may not be complete until early September, I was

24   going to propose bringing you back for a status conference

25   at the end of September and for the moment not calling it

1   a final or an interim but figuring we can figure out

2   whether it's a final or an interim as we get closer to

3   that time.  But if that's right, if that's okay with you,

4   I wanted to get that date and time now and then that helps

5   us to kind of cabin everything else in.  So, first of all,

6   are you all amenable to coming back to another conference

7   around the end of September as opposed to before then or

8   later than--

9           MR. WEINBERG:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. FISHER:  The government is, Your Honor.

12          THE COURT:  All right.  So let me get something

13  for that last week.

14          THE CLERK:  How about September 29th at 11

15  o'clock?

16          THE COURT:  I think Mr. Merritt doesn't have his

17  glasses on so it's hard for him to, okay.

18          MR. MERRITT:  It's good.

19          THE COURT:  Okay.  All right, so that'll be

20  September 29th.

21          THE CLERK:  Yup, at 11.

22          THE COURT:  All right, so now with respect to

23  the motions and the status of the case, I just want to get

24  a better idea on discovery and the way I'm trying to think

25  about this and so you can just help me understand, is if

4

1   you divide it into *Fowler* type stuff and non-*Fowler* type

2   stuff, with respect to the non-*Fowler* requests, how much

3   is still in dispute and how much discovery are we talking

4   about there?

5             MR. FISHER:  Yeah, I think there's very little

6   on the side of *Fowler*--

7             THE COURT:  Okay, so there's very, okay.

8             MR. FISHER:  --but I think it depends on how you

9   categorize some of the, although I, we categorize them in

10  the *Fowler* arena.

11            THE COURT:  Okay.

12            MR. FISHER:  The DOJ facts and, and whatnot.

13            THE COURT:  As do I.  I put all of that in there

14  too.

15            MR. FISHER:  So--

16            THE COURT:  So is everything, is that really--

17            MR. FISHER:  Pretty much everything else--

18            THE COURT:  --that's really the issue.

19            MR. FISHER:  --cause there, I think there may be

20  one or two.  I, one or two items I promised them.  One I

21  think they already have--

22            THE COURT:  Okay.

23            MR. FISHER:  --which would be an FBI memo that

24  went down to Washington.  I'm, I'm pretty sure that was

25  already produced.  There's one other, there was also a fax

5

1    that they wanted the headers on,--

2              THE COURT:  Um-hmmm.

3              MR. FISHER:  --and I have to sit down with the

4    trooper.  He would have the answer to that and because of

5    summer schedule haven't sat down with him.

6              THE COURT:  All right, so it's possible those

7    may not be disputed in terms of whether you're going to--

8              MR. FISHER:  Oh, it's already been turned over

9    and I agreed that I would, they have, they weren't sure

10   what the numbers were in the header.

11             THE COURT:  Okay.

12             MR. FISHER:  Yeah, I'm not sure either.  I think

13   either the CPAC Unit or the DA's office so I was going to

14   investigate that.

15             THE COURT:  All right, so in terms of things

16   that are being disputed though, it's all related to what

17   I'm calling kind of the *Fowler* stuff.  Is that right?

18             MR. FISHER:  That, I think that's fair to say.

19             THE COURT:  All right.  Okay.

20             MR. WEINBERG:  I, I should just, you know, and I

21   think Mr. Fisher accurately stated it depends on the

22   elasticity of the *Fowler* ambit?

23             THE COURT:  Yeah.

24             MR. WEINBERG:  We believe that particularly

25   given the most recent disclosures of the government's

6

1    position regarding *Fowler* and regarding the genesis of

2    December 23, 24 communications--

3           THE COURT:  Right.

4           MR. WEINBERG:  --we're going to put that within

5    *Fowler*, save that for argument on *Fowler* because if

6    December 23-4 is perceived by Your Honor as being outside

7    *Fowler*, then we have certain discovery requests that

8    relate to the governments most recent filing.  In other

9    words, we have a memo from the government, we have an

10   affidavit from Wyshak--

11          THE COURT:  Yeah, right.

12          MR. WEINBERG:  --respectfully they're relatively

13   un-particularized to the extent of the statements in a

14   memo that talk about conversations with a sergeant.

15          THE COURT:  Um-hmmm.

16          MR. WEINBERG:  We have no notes, no documents,

17          no

18   reports.  We have an affidavit from Mr. Wyshak which

19   suggests at least that someone else in his unit, which I

20   would proffer is likely to be Mr. Fisher--

21          THE COURT:  Um-hmmm.

22          MR. WEINBERG:  --is the person that had the

23   communications that have some legal significance.  We

24   don't have anything from the Middlesex District Attorney.

25   We don't have anything regarding the December 23 from

7

1    Sergeant Bullman--

2            THE COURT:  Um-hmmm.

3            MR. WEINBERG:  --and I, I'd ask I think a

4    subsidiary to the *Fowler* argument is the extent to which

5    the Middlesex DA and the Mass state police oversee as

6    being part of the quote "prosecution team" for *Brady*

7    purposes, and if so when did they become part of the

8    prosecution team, and whether or not the government is

9    assuming the obligations and review those files and give

10   us *Brady* to the extent that's included or whether instead

11   we have to come back the Court, make a Rule 17 subpoena

12   request to at least start the process of getting another

13   sovereign to produce documents that we think are essential

14   to the litigation of the federal case.

15           THE COURT:  Okay, and not that I want to jump

16   into it sideways like this but what, give me an example

17   just so I can think about that conceptually.  What would

18   be in your mind would be something that would be

19   exculpatory in the possession of say either the trooper or

20   the Middlesex DA's office for purposes of the federal

21   prosecution?

22           MR. WEINBERG:  Two, two categories.  One, it's

23   our respectful claim that there was no civil rights

24   investigation occurring on December 23 and 24 that could

25   conceivably exempt the pivotal conversation on the 24th

8

1   from the requirements of *Fowler* so that if Bullman,

2   Sergeant Bullman is calling the PCU or Mr. Fisher on the

3   23rd and saying, we have Tim Flaherty offering a state

4   victim money--

5           THE COURT:  Um-hmmm.

6           MR. WEINBERG:  --and that was what was

7   memorialized and that became the driving force, then that

8   is exculpatory to the extent of the requirement of

9   1512(b)(3) where there needs to be a passable federal

10  crime.  You can assume the worst about Mr. Flaherty's

11  conduct--

12          THE COURT:  Um-hmmm.

13          MR. WEINBERG:  --regarding the state informant

14  if all he was doing which we contend all he was doing is

15  discouraging him from going to a state criminal proceeding

16  or talking to a state prosecutor, that is not a federal

17  crime.  It only because conceivably--

18          THE COURT:  Right.

19          MR. WEINBERG:  --a federal issue if at the time

20  there was a viable federal civil rights investigation

21  which as Your Honor knows if wasn't so serious to Mr.

22  Flaherty with the idea of a fender bender in Central

23  Square being one of the 58 cases nationally in the context

24  of, you know, murderers and police brutality and prison

25  guard brutality and church burnings for them to really

9

1   make the case that we are conducting a serious federal

2   civil rights investigation of Ralph Feinberg over a single

3   sentence--

4           THE COURT:  Right.

5           MR. WEINBERG:  --without corroboration resulting

6   in no physical injury is just so implausible that we have

7   a right to be skeptical that this was something other than

8   an attempt to federalize a witness tampering in the state

9   court that was, that was quintessentially a state offense,

10  if an offense at all.

11          THE COURT:  All right.

12          MR. WEINBERG:  And so anything that can form--

13          THE COURT:  Okay.

14          MR. WEINBERG:  --that confirm--

15          THE COURT:  All right.

16          MR. WEINBERG:  --this was state not federal,

17  this was tampering, not civil rights is exculpatory under

18  1512, and under one of our principal defenses.

19          THE COURT:  All right, so in essence you're

20  already starting.  So let me, you know, I guess we can

21  just continue it and just kind of formalize it because you

22  know, I've read your memo.  I've read the government's and

23  I still come back to something that I had voiced earlier

24  on which is I'm still grappling with or I guess I'm still

25  not convinced that *Fowler* applies to this case.  I see

1  *Fowler*.  I see Justice Breyer there as having tried to

2  reconcile two parts of the statute that were somewhat at

3  odds with each other and in that context applying to the

4  situation where it's almost, it's a hypo.  It's not clear

5  who the communication would have been made to and for

6  exactly what purpose whereas here everything is clear.  We

7  know who all the actors were.  We know what the

8  communication was.  We know to whom the, to whom it was

9  made or to be made and so again, I read it again last

10  night.  I'm, so help me, help me--

11          MR. WEINBERG:  Sure.

12          THE COURT:  --on that.

13          MR. WEINBERG:  Let, let's, so let, let me first-

14  -

15          THE COURT:  And before you do that, so one thing

16  that I wanted to ask you.  If we were to determine, and

17  that's an if cause we're still working through it, but if

18  we were to find that *Fowler* doesn't apply--

19          MR. WEINBERG:  Yes.

20          THE COURT:  --how much of your motion, motions

21  go away or alternatively, do you have other grounds that

22  would justify you asking and collecting all of the stuff

23  you were asking for?

24          MR. WEINBERG:  Well, well the other grounds

25  would be, again I would back up and say it relates to

11

1    *Fowler* but even if the Court was to make a legal finding

2    that *Fowler* isn't applicable to both--

3            THE COURT:  Um hmmm.

4            MR. WEINBERG:  --December 23-4 and to the May

5    conversations as opposed to only one subset of the

6    evidence here, it would still be the issue of whether or

7    not the, the election of a federal civil rights

8    investigation was selectively focused on Mr. Flaherty and

9    not on Mr. Feinberg.

10           THE COURT:  But as the government says and isn't

11   that really kind of an offshoot of the--

12           MR. WEINBERG:  It is.

13           THE COURT:  --outrageous government conduct type

14   of doctrine and I mean it's there--

15           MR. WEINBERG:  Yes, but--

16           THE COURT:  --it's within their province to

17   sometimes go after people they want to go after.

18           MR. WEINBERG:  It's not their province to, to,

19   to federalize a state offense to avoid the Department of

20   Justice and have a single prosecutor on his own December

21   23 somehow make a state trooper, a state serg, a Mass

22   state sergeant, an agent of the federal government, all of

23   that, you know, is, it raises serious issues, and I

24   contend that more discovery is needed regarding to back up

25   the proffers by the government in a memo and I would

1  contest that an evidentiary hearing should be ordered by

2  the Court as to when the federal civil rights

3  investigation if any began.  And I say that in the context

4  of a very important memo that is written by the FBI that

5  is appended to my memo that says on, it's written by, by

6  the FBI on January 21 of 15 and it says on page one, "Per

7  an investigation currently being conducted by the

8  Cambridge Police."

9        THE COURT:  Right, um-hmmm.

10        MR. WEINBERG:  It doesn't say by the Mass state

11  police, doesn't say by an agent of the federal government

12  who's a Mass State Sergeant and it certainly doesn't say

13  FBI and then when you go to page six of that, I think this

14  is a very important document in terms of determining what

15  is the status of the investigation on this critical

16  December 24 date.  It says at the very end that there was

17  a meeting on January 7th, two weeks after December 24 with

18  the FBI, the Mass state police, the Middlesex DA, a U.S.

19  Attorney, and AUSA Fisher quote, "Indicated his office

20  would initiate a civil rights investigation."  Now that's

21  future language and it makes sense to me that they all

22  have this major meeting on January 7th--

23        THE COURT:  Um-hmmm.

24        MR. WEINBERG:  --it is a decision that they

25  would initiate, not that they're, not that the U.S.

13

1   Attorney has initiated.

2          THE COURT:  But let me play devil's advocate

3   with you for a second.  I mean and you know that sometimes

4   before you get all of human beings in a room to formally

5   agree that they're going to commence an investigation,

6   people have actually been thinking about it and talking

7   about it for some time, so that a statement like that

8   might mean something but it might just mean this is the

9   first time we've all gotten together and put this to paper

10  but in fact we actually started this process some time

11  ago, right?  So I mean you're not necessarily arguing that

12  that in and of itself would be dispositive that would just

13  be a factor I imagine.

14         MR. WEINBERG:  It's certainly enough to, to

15  warrant an evidentiary hearing and, and I would augment

16  that by talking about the, the idea that between December

17  23 and I'll assume that Mr. Fisher can reject my

18  assumption if he wishes that he was the person Mr. Wyshak

19  referred to.  He was the person that got the call on the

20  23rd.  He's the person involved on the 7th which we know.

21         THE COURT:  Um-hmmm.

22         MR. WEINBERG:  And that nothing is done

23  federally between December 23 and January 7th.  It's not

24  like there really was a criminal investigation.  The FBI,

25  they're not involved as the federal agency that

14

1   investigates civil rights cases--

2           THE COURT:  Um-hmmm.

3           MR. WEINBERG:  --until January 21.  This memo is

4   an opening memo to the FBI and there's not a single

5   sentence in any of the discovery that indicates that the

6   FBI did anything before the 21st.  The U.S. Attorney's

7   Office didn't do anything before the 7th.  We have no

8   evidence the Middlesex DA asked the US Attorney to involve

9   themselves before January 7th if indeed they ever did.

10          THE COURT:  Um-hmmm.

11          MR. WEINBERG:  We have a pending state case in

12  the Cambridge District Court for felonies and

13  misdemeanors.  This implicates two very important

14  policies.  Your Honor knows the first better than I is the

15  petite policy.  The federal government doesn't walk into

16  state, pending state cases as a second sovereign and start

17  federal criminal investigations or federal prosecutions

18  unless there's some compelling reason and I suggest here

19  that the facts of the Feinberg case are utterly lacking in

20  any compelling reason.  The only one offered is that this

21  man has a record.  In over 15 years on two or three

22  occasions he's made single sentence statements to a

23  stewardess about her son and to another young man in 1999.

24  Fifteen years, three sentences by a guy that's never

25  physically harmed anyone and there's been no weapon, and

1    in this case, and I think it's important when you ask is

2    it really plausible there was a good thing federal, civil

3    rights investigation while a state case was pending, and I

4    should say the state case remains pending and there is no

5    federal prosecution of Ralph Feinberg and there's not been

6    any real federal attention to the Feinberg case

7    independent of Tim Flaherty.  But in Central Square with

8    these videos, what happens here and I think it's important

9    is that Mr. Ritaburtri (ph), I'll call him Rita for

10   short--

11          THE COURT:  Um-hmmm.

12          MR. WEINBERG:  --he was driving a limo in

13   Central Square, he makes a left turn.  He goes down a

14   street and stops.  His intention is to back up, do a U-

15   turn and head to Harvard Square instead of heading to the

16   Mass Ave. Bridge.  Feinberg's car comes behind him.

17   Rita's car backs up.  There's a fender bender.  Feinberg

18   goes one direction.  Rita goes another direction.  That's

19   the end of it except Rita gets out of his car.  He's a

20   young healthy man.  Feinberg is a heavyset fella that

21   never gets out of his car.  Rita goes to talk to Feinberg

22   and they exchange words.  Feinberg has a cross complaint.

23   He says Rita threatened me.  Rita says Feinberg said I'm a

24   Muslim terrorist.  That's the end of it.  Rita says well

25   Feinberg grabbed my arm.  Well, that's fairly implausible

16

1    in the video.  Feinberg drove away.  The guy's in the

2    passenger seat.  That's the end of it.  There's no

3    corroboration.  There's no, the video and then there's

4    another witness named Mr. Figaroa.  Neither of them and

5    Figaroa's interviewed on February 3rd.  The videos are

6    available.  None of them make this a federal civil rights

7    case.

8              THE COURT:  All right, so on that I actually

9    have read it.  I understand, I think I understand your

10   argument intimately.  So, but let's circle back into all

11   of this kind of still gets us back to *Fowler*.

12             MR. WEINBERG:  Yes.

13             THE COURT:  All right, so why does that apply

14   here?

15             MR. WEINBERG:  Okay, so here is the exception to

16   *Fowler*.  The exception to *Fowler* is when a defendant has

17   in mind a particular individual whom he fears the victim

18   might communicate to the application of the statute is

19   clear.  If the person that Mr. Flaherty feared Mr. Rita

20   was going to communicate with was known to Flaherty as a

21   federal officer--

22             THE COURT:  Right.

23             MR. WEINBERG:  --that would end the *Fowler*

24   analysis.

25             THE COURT:  Right.

17

1      MR. WEINBERG:  There's no evidence anywhere at

2  least until May and let me reserve that--

3      THE COURT:  Right.

4      MR. WEINBERG:  --assuming no evidence in

5  December that Flaherty perceives this to be anything other

6  than Cambridge District Court, not a superior court, a

7  district court case where the accord and satisfactions and

8  a practice of trying to resolve assault cases when there's

9  no serious injury.

10      THE COURT:  Um-hmmm.

11      MR. WEINBERG:  We're going to give you if, Your

12  Honor, the transcript of December 24th so you can see the

13  words, it's purely, you know, we're going to work out an

14  accord and satisfaction and you're not going to go to

15  court and I'm going to explain to the prosecutor and we're

16  going to resolve this case if you'll accept, accept the

17  money.

18      Second, there's another exception to *Fowler* and

19  that's the Sam Smith one--

20      THE COURT:  Right, the first one was the Jim

21  Smith, right?

22      MR. WEINBERG:  Yeah, the first one was the Jim

23  Smith one, John Smith--

24      THE COURT:  John Smith.

25      MR. WEINBERG:  --who is a federal officer and

18

1    Mr. Flaherty would have to know it and fear it.

2            THE COURT:  Right.

3            MR. WEINBERG:  The second one is that the

4    communication is that, that Flaherty desires to prevent is

5    to Sam Smith who he doesn't know is a federal officer, but

6    who is one.  So let's, let's go back with those two

7    exceptions.  The first exception doesn't apply.  He

8    certainly doesn't know that Mr. Rita is in communication

9    with John Smith, the federal officer, but Mr. Rita is, who

10   is Mr. Rita in communication with in fact on December 24?

11   He's in communication with the Middlesex District

12   Attorney's Office and he's in communication in, in an

13   implicit way with the Cambridge police as the arresting

14   investigating group, and he's in communication implicitly

15   with the Middlesex Superior Court judge.  Now this statute

16   that he's charged with and *Fowler* have nothing to do with

17   judges, nothing to do with state proceedings.  We can't

18   imagine by substitute an imaginary federal proceeding

19   against Feinberg that doesn't exist for a real state

20   criminal proceeding.  So the idea that Mr. Flaherty can go

21   and say, I don't want you to talk to a state judge, that's

22   not a federal crime under this statute.  That would be the

23   *Aguilar* case, a different statute and it wouldn't be the

24   basis to find *Aguilar* cause there's no nexus to a, a

25   potential federal judicial proceeding as to Feinberg.  If

19

1    he said don't talk to the DA, that's outside the statute

2    I would contend.  This is a law enforcement officer's

3    statute.

4              And secondly, the District Attorney's Office is

5    not involved in these conversations on December 23 and 4

6    as far as you know from Mr. Merritt's memo and from Mr.

7    Wyshak's affidavit--

8              THE COURT:  Um-hmmm.

9              MR. WEINBERG:  --sergeant Bullman went outside

10   and around and circumvented the logical prosecutor to talk

11   to regarding a witness tampering issue in a state case.

12   It's one of the reasons I suggest we need either more

13   discovery or an evidentiary hearing because it's utterly

14   implausible that a Mass State Sergeant working every day

15   with the Middlesex District Attorney's Office is going to

16   pick up the phone and call the public corruption unit and

17   ask to speak to Mr. Fisher.  Again, I'm making an

18   assumption it was he and not others and say, whoa, we have

19   a witness in a Cambridge District Court case and there is

20   an attempt by Mr. Flaherty to contact him and meet with

21   him, please federalize him.  It's just not plausible but

22   if, if it's true, we need a hearing.  We need further

23   facts.  We need affidavits from Mr. Fisher, Sergeant

24   Bullman.  The Middlesex DA's office is completely being

25   circumvented on January 7th.  Again, if they did that it

20

1    would be against petite.  It would not meet the

2    certification requirements of 249 which is the ultimate

3    federal civil rights statute that's being proposed and I

4    would suggest, Your Honor, that it would come close to

5    violating the Department of Justice's own manual which

6    requires criminal division supervision.  When you're

7    subpoenaing a criminal defense lawyer on a matter that

8    they know will result in his disqualification or conflict

9    with his own client, you need criminal division

10   involvement if you're going to search a lawyer.  And I

11   would say that it is not plausible to believe that a man,

12   Mr. Fisher, a man of his experience is unilaterally going

13   to federalize a taping of a criminal defense lawyer

14   knowing that that would end in his or risk his

15   disqualification and a Sixth Amendment representation.

16   That's a serious, serious decision.  We don't have a shred

17   of paper as to what happened on this call, not Mr.

18   Bullman's notes, not Mr. Fisher's memo, nothing.  We only

19   have a very eloquent memo offered by Mr. Merritt in Mr.

20   Fisher's absence.  So I would suggest far more is needed

21   here but let's look at Sergeant Bullman.

22            THE COURT:  Um-hmmm.

23            MR. WEINBERG:  You know, let's assume that he

24   picked up the phone and knew Mr. Fisher and didn't like

25   the DA, and decided on his own that he was going to, you

21

1    know, try to walk this case to a different sovereign.

2    The government says well, we effectively deputized him.

3    What does that mean?  Does that mean any assisted U.S.

4    attorney can on his own without authorization from the

5    justice department, from Ms. Ortiz, from the FBI which

6    doesn't get involved for four more weeks, make someone a

7    federal agent?  An agent of who?  He's not an agent of the

8    FBI.  They don't start their investigation till the 21st.

9    Does he get agents becoming an assistant U.S. Attorney?

10   Is he hired by the U.S. Attorney?  If he went and

11   committed a some offense would the federal government be

12   responsible under the Tort Claim Act?  Is he really under

13   the statute authorized to act for the United States?  Well

14   18 U.S.C. 1515 does include people authorized to act for

15   the United States but I submit we need an evidentiary

16   hearing.  We need far more than the proffer that has been

17   submitted by the United States up to now to make all of

18   these very important judgments.

19            But getting back to *Fowler* on the 24th, may I

20   hand this to you--

21            THE COURT:  Yeah.

22            MR. WEINBERG:  --and may I ask it to be placed

23   under seal because it's really an unadjudicated electronic

24   surveillance.

25            THE COURT:  Okay.

22

1          MR. WEINBERG:  This is a transcript, rough

2    transcript that we prepared and are offering only for the

3    purpose of--

4          THE COURT:  Of this hearing.  Sure.  And I'll

5    note you've provided a copy to the government?

6          MR. WEINBERG:  We have.

7          THE COURT:  All right.

8          UNIDENTIFIED:  This is, the government prepared

9    this.

10         THE COURT:  We'll call it Exhibit 1.

11           DEFENDANT'S EXHIBIT NO. 1, ADMITTED

12         MR. WEINBERG:  So *Fowler* really deals with the

13   idea of and I'll ask Your Honor, to take a good look at

14   that--

15         THE COURT:  Okay.

16         MR. WEINBERG:  --because you'll see that it

17   deals with a specific state judicial proceeding and

18   nothing to do with preventing communications to Sam Smith

19   or John Smith.

20   PAUSE

21         THE COURT:  Okay.

22         MR. WEINBERG:  I'm going to end briefly.

23   *Fowler,* I contend that this is a quint, quintessentially

24   State Court matter on the 23rd and 24th.  This tape

25   recording is a quintessentially State Court focused

23

1   matter.  If it's wrong, if it's outside of the accord

2   and satisfaction.  It is clearly dealing with resolving a

3   state judicial proceeding with at most the discussion

4   about how the witness should communicate with the state

5   district attorney that yes, theoretically with a single

6   sentence of, of bad language you could theoretically say

7   that this is a civil rights issue.  That this is right to

8   what Justice Breyer talked about, which is we have a dual

9   sovereign system and that he used the example of marijuana

10  arrests, that marijuana is both a federal and state crime,

11  that the federal government doesn't go around and create

12  federal criminal investigations with the possession of

13  marijuana, and a very, very small percentage of marijuana

14  arrests are federally.  I submit the federal government

15  doesn't go around and create federal civil rights

16  investigations of people like Ralph Feinberg when it's a

17  one-to-one verbal dispute, no injury and no violence to

18  the extent of harm or a weapon's or guns, no official

19  badge, no policeman, no sheriff.  It's bad enough they

20  don't create federal civil rights investigations of

21  policemen to go and shoot people much less a fender bender

22  in Central Square, and so you get back to, and this is the

23  issue for Your Honor, I think there's two issues here.

24  *Brady*, we would contest that *Brady* requires the disclosure

25  of any document that memorializes that the purpose of the

24

1  federal government opening an investigation, whether it

2  was December 24 where we have the first signs of some

3  interest or January 7 where we have an FBI report saying

4  there was a meeting and Mr. Fisher would initiate on

5  January 21 he extended this targeted on Tim Flaherty,

6  supports our proposition that there was no legitimate

7  civil rights or no real possibility Ralph Feinberg was

8  going to be federally prosecuted while a state case was

9  pending, and this was all about federalizing the Tim

10 Flaherty investigation or B, that despite whatever calls

11 occurred between Sergeant Bullman and Mr. Fisher on the

12 23rd and despite whatever was entered in the federal system

13 on the 24th, there was not an ongoing concrete federal

14 criminal investigation until after the taping on December

15 24, and that therefore the 24th must be subject to the

16 *Fowler* test.  Was it reasonably likely on February 24 that

17 there was going to be a hard real federal civil rights

18 investigation stash/prosecution and I think there was

19 sufficient of the empirical evidence through the Petite

20 Policy and certification of 249, the answer to that is

21 eloquent and clear, no?  In terms of May, we've submitted

22 in writing, Your Honor, why we think in May that this was,

23 and Your Honor may call it an outrageous government

24 conduct where the manufacturing of an element is required

25 as statute, but whatever it is the *Armstrong* case which is

25

1   what the government points to doesn't exclude our right

2   to discovery.  It gives us a right to discovery if there's

3   a showing that discovery can support the selectivity of

4   that prosecution.  Here, we have made that showing through

5   the empirical evidence that shows there were 58 cases

6   nationwide in the, in the year 20, I think it's 14, and

7   there's only been one federal civil rights prosecution in

8   this district for three years.  So the showing that it was

9   not reasonably likely that there was going to be a federal

10  civil rights prosecution is, has been made just by the

11  empirical evidence and--

12          THE COURT:  But my guess is you'd argue that if

13  the stats showed a lot of civil rights prosecutions that

14  those don't necessarily effect how we should be viewing

15  the facts of this case.

16          MR. WEINBERG:  I would concede that if there was

17  a regularly prosecuting people on the uncorroborated claim

18  of the verbal dispute as there was in Central Square here,

19  that my argument that it was not substantially likely

20  there was going to be a civil rights prosecution would be

21  deeply dampened--

22          THE COURT:  Um-hmmm.

23          MR. WEINBERG:  --but those facts are, are

24      contrary to

25  a year after year record.

26

1      THE COURT:  And you consistently use the term

2  prosecution, but aren't investigations that don't

3  necessarily result in prosecutions a large part of the

4  picture for DOJ and, therefore, aren't the stats that

5  you're referring to somewhat skewed because those reflect

6  only those cases where somebody determined that we have

7  enough evidence to prove it beyond a reasonable doubt.

8      MR. WEINBERG:  Absolutely, Your Honor, and, and

9  that, but the, the stats gets me in the door to satisfy

10  the *Armstrong* standard, and Your Honor has put your finger

11  on exactly why we need Your Honor to grant the discovery

12  request because we don't have, how many cases do the FBI

13  investigate.  Of those cases, how many were pending state

14  cases?  Of those cases, how many had no physical injury?

15  In other words, is it reasonably likely that independent

16  of Tim Flaherty's efforts to resolve the state case that

17  the FBI was going to join the Mass state police and they

18  were both going to join the Cambridge police.  By the way,

19  there's no evidence the Mass state police did anything

20  here except conduct tape recordings of Mr. Flaherty, but

21  Your Honor has put your finger on why this is important

22  evidence that, you know, we've, we've established that

23  there's one prosecution in three years.  Is it really

24  going to be Ralph Feinberg for saying a single sentence, a

25  one-to-one dispute that's being prosecuted equally by a

27

1  very tough District Attorney's Office and if the answer

2  is probably not then we have satisfied, I contest that

3  threshold that *Armstrong* requires for our receiving the

4  kind of evidence where we can prove to Your Honor that

5  just like the prosecutions don't occur, the FBI doesn't

6  get involved in these kind of cases.

7          THE COURT:  Okay.  All right.  Thank you.

8  Anybody from the government wish to be heard?

9          MR. MERRITT:  Well, Your Honor, I, I think, you

10 know, most of the arguments, it's really what was in their

11 favors and it all goes back to, to the fact that *Fallor*

12 deals with hypotheticals.

13         THE COURT:  Um-hmmm.

14         MR. MERRITT:  This was not a hypothetical

15 communication and we don't need an evidentiary hearing for

16 purposes of the discovery motions.  If the Court accepts

17 and there's no, been no reason not to accept the affidavit

18 of Mr. Wyshak, that an investigation of both offenses was

19 opened on 23rd, based on information on the 23rd and, and

20 was in play on the 24th.

21         THE COURT:  Okay, so let me ask you a question

22 about that.  Assume for the sake of argument I want to

23 accept all of the representations of the government, so

24 the Wyshak affidavit, everything that's in the governments

25 memoranda and I do, assume for the sake of argument it's

28

1   true, but at the same time you've got a defendant who

2   was saying, but I'm out here in the dark screaming that

3   what they're saying smells bad.  It's just not plausible.

4   It just doesn't work.  As a matter of law, are they, is

5   the answer sorry, you can be suspicious of our

6   representations.  You can continue to think it's just not

7   plausible.  We might initiate an investigation for an

8   incident like this at this juncture but that doesn't give

9   you a basis to force us to open our door and to open the

10  curtain so you can peer behind, or does that sometimes, I

11  mean there comes a point when the Court can say, yeah,

12  just, it just seems so outlandish that that in and of

13  itself should make this an exceptional circumstance

14  warranting further discovery.

15          MR. MERRITT:  Well I, I think that there could

16  be situations, but for purposes of the discovery motions

17  at this point--

18          THE COURT:  Right.

19          MR. MERRITT:  --if the Court accepts as true the

20  fact that a case was opened by the U.S. Attorney's Office

21  on those offenses then I would suggest that all their

22  other arguments just don't matter because now the argument

23  is well, wait a second.  Yes, all right, we'll concede

24  they, they did open the investigation but we claim that it

25  was subterfuge, that they really didn't care about that

1  civil rights claim, and the fact of the matter is this

2  is now this kind of manufactured jurisdiction argument

3  which is, is basically never really succeeded except in

4  that one case in Archer as far as I can tell, and in fact

5  when it was raised before Judge Wolf in the *Jokich* (ph)

6  case, the court found that the mere fact that the

7  government caused and intended to cause a federal crime to

8  be committed where only a local or foreign crime might

9  otherwise have existed is not outrageous misconduct.  So

10 even if, even if you were to credit their kind of spurious

11 allegation that the government opened up an investigation,

12 perhaps not really thinking that it was going to end up in

13 a prosecution, that would not rise to the level of

14 outrageous government misconduct that would otherwise now

15 justify the kind of wholesale and intrusive discovery that

16 they're requesting which also, I would submit, Your Honor,

17 is prohibited by Rule 16(a)(2) which deals with internal

18 memorandum made by government attorneys and agents about

19 an investigation or a case.  So, you know, their arguments

20 keep, you know, sort of depend on each other but I think

21 both of them don't hold weight.

22          THE COURT:  Okay.

23          MR. MERRITT:  The other point which I think

24 keeps getting lost is that they, they seem to be

25 suggesting at different times that, you know, it, it

1  wasn't reasonable or plausible to Mr. Flaherty that such

2  an incident could be investigated by federal authorities,

3  and of course that is completely irrelevant under any of

4  these cases cause it's not about his intent.  It's clear

5  that the law has never changed, that he does not to have,

6  does not have to have a state of mind as to whether or not

7  it is a federal or a state officer who communication he's

8  trying to prevent.  So you know, again that's not a

9  particularly cogent factor in this case.

10         THE COURT:  Okay.

11         MR. MERRITT:  So, I, I think that the Court has

12  a sufficient basis to find A, that *Fowler* doesn't apply

13  and therefore, 90% of what they're asking for is really

14  not warranted.

15         THE COURT:  Okay.

16         MR. WEINBERG:  If I could just take a minute to

17  reply.  First of all, this is not just generic government

18  work product.

19         THE COURT:  Um-hmmm.

20         MR. WEINBERG:  Briefs filed by Mr. Merritt,

21  focus on December 23 and 4 by then their anti-*Fowler*

22  argument that there was a federal criminal investigation

23  where it made factual assertions, and just like Mr. Wyshak

24  can file an affidavit to support them, the Court certainly

25  has the discretions to inquire that Mr. Fisher, Sergeant

31

1    Bullman file, that Bullman has notes.  He is made as a

2    member of the prosecution team.  Again, I ask that if they

3    are members of the prosecution team, then the Mass state

4    police are not protected by attorney work product that

5    they should be required to provide their documents, their

6    notes, their memos.

7            Similarly when the government says we have

8    authorized someone to be a federal agent, where's the

9    authorization?  Mr. Wyshak doesn't address that.  The

10   government says effectively authorized.  When they say we

11   approved the taping of the criminal defense lawyer, where,

12   it should, right now it's just air.  It's, it's a, a memo

13   of law that makes factual assertions that Your Honor has

14   every right as a magistrate judge to require a

15   particularized backed up in discovery he provided.

16   They're fact witnesses doing essential element of a

17   federal criminal charge against a criminal defense lawyer,

18   that being that as Mr. Merritt says, you don't have to

19   intend to be communicating to a federal officer, but has

20   to be reasonably likely he prevented that communication

21   because a phone call was made on December 23 and somebody

22   types something into a system does not initiate a federal

23   criminal investigation.  That investigation was not

24   initiated.  Nothing happened.  Nothing was done.  The, the

25   date that the FBI which is the only party that's within

1    the statute, this is a law enforcement statute repeating

2    communications to law enforcement, they didn't have their

3    first involvement open on the case file until four weeks

4    later, so that's *Fowler*.  Was it reasonably likely on

5    December 23 that the feds would get involved?

6              THE COURT:  Okay.

7              MR. WEINBERG:  And that simply having a phone

8    call from Bullman to Fischer on the 23rd does not magically

9    transform a Cambridge District Court/Middlesex DA's case

10   into a federal criminal investigation.

11             Thank you very much, Your Honor.

12             THE COURT:  Thank you.  All right, I think with

13   the benefit of that we can go back and wade through this.

14   As I indicated at the outset my schedule's going to be a

15   little sporadic over the next couple of weeks.  So

16   hopefully by the early part of September we can resolve

17   these, and just for the record, there are three

18   outstanding motions that I see, motion requiring the

19   government to produce the DOJ material, motion to strike

20   and then a supplemental motion for discovery, filed most

21   recently by the defense.  Are those?

22             MR. BUTTERS:  Yeah, they are and my motion to

23   strike maybe moot now since we've caught up with the

24   timing.  I, when the motion was based on the fact it was a

25   bit premature under the local rules so--

33

1          THE COURT:  Okay.

2          MR. BUTTERS:  --that may be moot.

3          THE COURT:  All right.

4          MR. FISHER:  I, I think the first motion is kind

5  of subsumed by their supplement.

6          MR. WEINBERG:  We, we reincorp, we both I

7  think--

8          THE COURT:  Okay.

9          MR. WEINBERG:  --reincorporated explicitly and--

10          THE COURT:  All right.  So we'll make it clear

11  that when we deal with that and the first two are pretty

12  much subordinate to the most recent one so.

13          All right, is there anything else that we need

14  to address, and I know that's this is the big issue and

15  we'll get to it as quickly as we can, but otherwise is

16  there anything else we need to address today?

17          MR. FISHER:  Other than excluding time, Your

18  Honor, no.  I did, I did file the, the interim status

19  report.

20          THE COURT:  Yeah, I mean yeah, and the motions

21  are pending so--

22          MR. FISHER:  Sure.

23          THE COURT:  --I the clock has tolled so, all

24  right.

25          COUNSEL:  Thank you, Your Honor.

34

1          THE COURT:  All right, thank you everybody.

2     (Court adjourned)

3     (10:59:00 AM

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

CERTIFICATION

1

2      I, Maryann V. Young, court approved transcriber,

3  certify that the foregoing is a correct transcript from

4  the official digital sound recording of the proceedings in

5  the above-entitled matter.

6

7  /s/ Maryann V. Young              April 27, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**